UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

HOLLY MCKNIGHT,                              12-CV-1257-LJV-MJR

               Plaintiff,                    REPORT AND RECOMMENDATION

   -v-

TOWN OF HAMBURG,

               Defendant.
_____

    This case has been referred to the undersigned for all pre-trial matters, including

the preparation of a report and recommendation on dispositive motions.  (Dkt. No. 40).

Before the Court is defendant Town of Hamburg's motion for summary judgment.  (Dkt.

No. 28).  For the following reasons, it is recommended that the motion be granted.

**BACKGROUND**

    Plaintiff Holly McKnight, a retired female police officer, commenced this

employment discrimination action in 2012 against her former employer, the Town of

Hamburg (the "Town").  (Dkt. No. 1).[1]  McKnight's amended complaint alleges that the

Town discriminated against her in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §2000e *et seq.*, the Americans With Disabilities Act ("ADA"), 42

U.S.C. §12112(a), the New York State Human Rights Law ("HRL"), N.Y. Exec. Law

§290 *et seq.*, and Section 120 of the New York State Workers' Compensation Law

("WCL").  (Dkt. No. 9).  The following facts are taken from the pleadings and motion

papers in this action, including the Town's Statement of Material Facts Not in Dispute

("SOF") (Dkt. No. 28-1).  When citing a proposed fact within the Town's SOF, the Court

---

[1]    Page number citations for docket entries refer to the page number(s) assigned by CM/ECF.

has confirmed that McKnight's responding statement (Dkt. No. 36-1) either admits the fact or fails to specifically controvert it with evidence. *See* W.D.N.Y. L.R. Civ. P. 56(a).

McKnight was employed by the Town from 1988 until December 2010, when she retired. (Dkt. No. 28-1 ¶¶1, 83).[2]  McKnight was a satisfactory officer who was never disciplined. (*Id.* ¶16).  During the course of her employment, McKnight was involved in various work-related incidents, some of which resulted in injuries.  The following incidents are relevant to the Town's motion.  On March 2, 2001, McKnight injured her right arm, shoulder, hip, and back while attempting to apprehend a suspect. (*Id.* ¶26 (noting injuries to right arm, shoulder, and hip); Dkt. No. 36-1 ¶26 (noting that McKnight also injured her back)).  As a result of her injuries, McKnight was out of work between March 2 and March 6, 2001, when she returned on a light duty basis. (Dkt. No. 28-1 ¶26).  McKnight returned to full, unrestricted duty on May 21, 2001. (*Id.*).  On September 30, 2002, McKnight went on leave to repair a rotator cuff tear she sustained during the March 2001 incident. (*Id.* ¶30).  She returned to work in April 2003. (*Id.* ¶31).  Two months later, in June 2003, McKnight injured her right shoulder while reaching for an object behind a passenger headrest. (*Id.* ¶33).  In July 2004, while on patrol, McKnight's vehicle hydroplaned and went off the road. (*Id.* ¶34).  Although McKnight complained of back pain, she returned to work the very next day. (*Id.*).  In April 2009, McKnight injured her back during a training session. (Dkt. No. 36-2 ¶14).  McKnight contends that she advised her supervisors about the injury (*id.*); the Town contends, however, that McKnight completed the training session without incident. (Dkt.

---

[2]     In different sections of its SOF, the Town contends that McKnight retired in October, November, and December of 2010. (Dkt. No. 28-1 ¶14 (October 2010); *id.* ¶1 (November 2010); *id.* ¶83 (December 2010)).  At her deposition, McKnight testified that she retired effective December 3, 2010. (Dkt. No. 29-3 at 50).  Thus, it appears that December 3, 2010 is McKnight's actual retirement date.

No. 28-2 ¶48).  In May 2009, McKnight filed a workers' compensation claim for injuries arising out of the July 2004 automobile incident, but not the April 2009 training session. (Dkt. No. 28-1 ¶37).   McKnight thereafter voluntarily withdrew her workers' compensation claim.  (*Id.* ¶39).

Two months after the training session, on or about July 23, 2009, McKnight went on "sick leave" and remained on leave until she retired in late 2010.  (*Id.* ¶¶40, 83). Although McKnight argues that her retirement was involuntarily, she does not assert a constructive discharge claim.  While out on leave, McKnight used her accrued sick time, vacation time, and personal leave time.  (*Id.* ¶41).  McKnight contends that the Town took the following adverse actions against her after she went on leave.

### *Leave Policy Violation and Docking of Pay*

The collective bargaining agreement ("CBA") between the Town and McKnight's union, Southtowns Police Club, Inc., requires an employee who is on any form of paid or unpaid sick leave, workers' compensation leave, or disability leave to remain at her residence during her normal duty hours, unless she receives permission from the Chief of Police to leave her residence.  (*Id.* ¶¶44-45).  In August 2009, the Town delivered McKnight a letter reminding her of this policy.  (*Id.* ¶46).  Nevertheless, on October 3, 2009, McKnight left her home two hours before the end of her scheduled shift to pick up a dress at a local mall.  (*Id.* ¶¶49-50).  The Town learned of McKnight's trip, docked her a full day's pay, and threatened to terminate her.  (Dkt. No. 36-2 ¶33).

### *Denial of General Municipal Law §207-c Benefits*

In February 2010, McKnight, through her union attorney, demanded that the Town grant her N.Y. General Municipal Law ("GML") §207-c benefits "for all medical

costs and lost wages which were the result of multiple on-duty injuries." (Dkt. No. 28-1 ¶51).  Under §207-c "any member of a police force of any . . . town . . . who is *injured in the performance of [her] duties* . . . shall be paid by the municipality by which [she] is employed the full amount of [her] regular salary or wages until [her] disability arising therefrom has ceased, and, in addition such municipality shall be liable for all medical treatment and hospital care necessitated by reason of such injury."  N.Y. GML §207-c(1) (emphasis added).  By letter dated February 18, 2010, the Town denied McKnight's request for §207-c benefits without explanation.  (Dkt. No. 28-1 ¶52; Dkt. No. 28-4 at 62).  McKnight appealed.  (Dkt. No. 28-1 ¶53).  On March 1, 2010, the Town found McKnight ineligible to receive benefits for injuries she allegedly sustained during the July 2004 car accident because she did not take time off after the accident.  (*Id.* ¶54).  On March 11, 2010, presumably to put the Town on notice that she was seeking §207-c benefits for injuries she sustained during the April 2009 training session, not just the injuries she sustained during the 2004 car accident, McKnight submitted a Supervisor's Report of Incident with respect to the training session.  (*Id.* ¶56).  Then, on March 15, McKnight submitted a §207-c benefits application for injuries incurred during the April 2009 training session and other incidents.  (*Id.* ¶57; Dkt. No. 28-4 at 74).  The Town denied the application on April 8.  (Dkt. No. 28-4 at 82).  In addition to reiterating the reasons set forth in its March 1 determination, the Town's April 8 determination found that McKnight was not injured during the April 2009 training session because a comprehensive physical examination taken shortly after the session showed that she did not suffer from a work-related disability.  (*Id.*).  McKnight thereafter filed an Article 78 proceeding in New York State Supreme Court challenging the denial of benefits.  (Dkt.

No. 28-1 ¶60).   State Supreme Court Justice Timothy Drury dismissed McKnight's proceeding, finding that the Town's decision to deny McKnight benefits was neither arbitrary nor capricious and had a rational basis.  (Dkt. No. 29-4 at 42).   However, Justice Drury did note, in dicta, that the Town's decision to deny benefits was not supported by substantial evidence.  (*Id.* at 42-43).

### Denial of Access to Sick Bank

The CBA establishes a sick bank through which police officers may request paid leave time.  (Dkt. No. 28-1 ¶64; Dkt. No. 28-3 at 43).   An employee who wishes to use the sick bank must apply to a committee comprised of the Chief of Police (or his designee), the Union President (or his designee), and a third person to be selected by the Town and the Union.  (Dkt. No. 28-3 at 43).   An employee's sick bank application may be denied if she "fail[s] to cooperate in a timely manner with a committee request." (*Id.*).

On June 23, 2010, McKnight submitted a sick bank application requesting paid leave time for a "work-related back injury."  (Dkt. No. 28-1 ¶67).   Pursuant to the CBA, a three-person sick bank committee reviewed McKnight's request.   The first two members of the committee were Assistant Chief of Police John Conlon and Union President Joseph O'Brien.   (*Id.* ¶73.)   Conlon and O'Brien then selected a third committee member, Town of Hamburg Youth Bureau Director Mary Eisenhauer.   (*Id.*).   On July 1, 2010, the committee allowed McKnight to access the sick bank for one month, on the following conditions:

> The committee requests an updated prognosis from at least two doctors as to Officer McKnight's current physical status and a definitive answer to the question of her disability status.

Officer O'Brien also will be working with Officer McKnight through the union to clarify the status of her retirement application, workmans['] comp case and social security application. Officer O'Brien will update the committee when he has this info.

The committee requested this information be received within three weeks at which time we will hold another meeting.

(Dkt. No. 28-4 at 90).

On July 29, 2010, the sick bank committee reconvened and voted to terminate McKnight's sick bank access based on her failure to produce the documentation it requested during its July 1, 2010 meeting. (*Id.* at 103). The committee agreed, however, to review any information McKnight might later produce regarding her eligibility to access the sick bank. (*Id.*). McKnight argues that the Town is to blame for her purported failure to timely submit the requested documentation because it negligently failed to obtain certain records from her physician. (*See* Dkt. No. 36-2 ¶44; Dkt. No. 36-4 at 2).

### *Denial of Light Duty*

McKnight contends that after she went on leave, she could have returned to work on a light duty basis, but the Town refused to grant her this accommodation. Relevant to this contention is the Town's "Light Duty Policy," informally known as the "Light at the End of the Tunnel" policy. (Dkt. No. 28-1 ¶70). The Policy provides that "[t]emporary light duty assignments, when available, are for officers and other eligible personnel in the department who, because of injury or illness, are *temporarily unable* to perform their regular assignments but are capable of performing alternative duty assignments." (*Id.* ¶68 (emphasis added)). Under the Policy, an employee seeking a light duty assignment

must "produce a physicians [*sic*] report that indicates such employee will be able to *return to full duty within a six month period*." (*Id.* ¶69 (emphasis added)).  The Town instituted the Light Duty Policy because the number of officers on indefinite light duty created staffing problems for the police department. (*Id.* ¶70).  More specifically, as the number of officers on light duty increased, fewer officers were available to work patrol. (*Id.*; Dkt. No. 28-2 ¶21).  The Town instituted the Light Duty Policy in 2008. (Dkt. No. 28-1 ¶68).  While McKnight points out that her union did not adopt the Policy until 2012 (Dkt. No. 36-2 ¶28), she acknowledges that the Town instituted the Policy in 2008 (Dkt. No. 28-1 ¶68), and she does not claim that enforcement of the Policy was contingent on union approval.

Although it is unclear whether McKnight ever formally requested a light duty assignment, her June 23, 2010 sick bank application raises the possibility of light duty. (Dkt. No. 28-4 at 85).  In addition, on or about July 7, 2010, McKnight's physician sent the Town a letter setting forth "light duty restrictions" for McKnight. (*Id.* at 87).  It is undisputed that the Town did not grant McKnight a light duty assignment.

McKnight's ability to return to full duty within six months, as required under the Town's Light Duty Policy, is called into question by a disability retirement benefits application she submitted soon after she went on leave.  Specifically, in August 2009, McKnight applied for New York State Accidental Disability Retirement Benefits. (Dkt. No. 28-1 ¶42).  McKnight's application states that she is "permanently disabled" as a result of back and neck injuries she sustained in March 2001 and July 2004. (*Id.* ¶43).  On June 7, 2011, the New York State and Local Police and Fire Retirement System

found McKnight "permanently incapacitated for the performance of duties" and awarded her retirement benefits retroactive to August 7, 2010.  (*Id.* ¶¶84-85).

On October 4, 2010, the Town gave McKnight notice of administrative termination of employment, effective November 4, 2010, on account of her inability to return to full duty within one year of commencement of leave.  (Dkt. No. 28-2 ¶97; Dkt. No. 28-4 at 105-07).  On November 3, McKnight commenced an Article 75 proceeding in State Supreme Court to enjoin the Town from terminating her employment.  (Dkt. No. 28-1 ¶82).  McKnight thereafter withdrew her petition and opted to retire effective December 3, 2010.  (*Id.* ¶83).

On November 12, 2010, after the Town gave McKnight notice of termination, but before she retired, McKnight filed a sex and disability discrimination complaint with the New York State Division of Human Rights ("SDHR").  (*Id.* ¶89).  McKnight's SDHR complaint was the first time she complained to the Town about sex discrimination.  (*Id.* ¶88).  In May 2012, the SDHR issued a determination of no probable cause and dismissed McKnight's complaint.  (Dkt. No. 29-2 at 16-17).  McKnight then commenced this action in December 2012.  (Dkt. No. 1).  Her amended complaint sets forth five causes of action:  (1) a Title VII sex discrimination claim, (2) a HRL sex discrimination claim, (3) an ADA failure to accommodate claim, (4) a HRL failure to accommodate claim, and (5) a WCL §120 discrimination claim.  (Dkt. No. 9).  McKnight has since withdrawn her WCL claim.  (Dkt. No. 36 at 21).  McKnight's sex discrimination claims are premised on disparate treatment and sexist comments purportedly made by the Town's Chief of Police, Michael Williams, while her failure to accommodate claims allege that the Town wrongfully denied her light duty.  (Dkt. No. 9).

In December 2014, after discovery concluded, the Town moved for summary judgment on all of McKnight's claims. (Dkt. No. 28). In support of dismissal of McKnight's sex discrimination claims, the Town argues that McKnight cannot make out a prima case because she is not qualified for her position, she has no evidence that she was treated less favorably than male officers, and Williams' alleged sexist comments are non-actionable stray remarks. (Dkt. No. 30). The Town further argues that even if McKnight could establish a prima facie case, it had legitimate, non-pretextual reasons for each adverse action it took against McKnight. (*Id*.). With respect to McKnight's disability claims, the Town argues that McKnight never requested a reasonable accommodation, and even if she did, she could not be accommodated because she was permanently disabled. (*Id*.).

In opposition to the Town's motion, McKnight argues that Williams' sexist remarks, along with the fact that she was treated less favorably than male police officers, creates an inference of discrimination. (Dkt. No. 36). In support of her disability claims, McKnight argues that the Town should have granted her an indefinite light duty assignment. She further argues that she could have undergone surgery to ameliorate her disability, making it possible that she could have returned to full duty within six months, as required under the Light Duty Policy.

The Court heard oral argument on the Town's motion on March 14, 2016. During argument, the Court permitted the parties to submit supplemental memoranda of law addressing *Robinson v. Concentra Health Services, Inc.*, 781 F.3d 42 (2d Cir. 2015), a case in which the Second Circuit held that a disability benefits application may estop a

plaintiff from later arguing in an employment discrimination action that she was qualified for her position.

## <u>DISCUSSION</u>

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). Once the moving party has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must "come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks and citation omitted). While the Court must construe the evidence in the light most favorable to the nonmoving party, *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011), to defeat summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

In an employment discrimination case, the Court must be "particularly cautious about granting summary judgment . . . when the employer's intent is in question." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). "Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show

discrimination.'" *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)).   That said, a plaintiff cannot defeat summary judgment simply by offering purely conclusory allegations of discrimination.   *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

   I. *Sex Discrimination Claims*

  McKnight's Title VII and HRL sex discrimination claims are governed by the *McDonnell Douglas* burden-shifting analysis.   *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).   First, McKnight must establish a prima facie case of discrimination by showing (1) she belonged to a protected class, (2) she qualified for the relevant position or benefit, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.   *Id.* at 435.   If McKnight establishes a prima facie case, the burden of production shifts to the Town to offer legitimate, nondiscriminatory reasons for its actions.   *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997).   If the Town makes this showing, the burden shifts back to McKnight to show that the Town's proffered reasons are a pretext for discrimination.   *Id.*

   A. *Member of a Protected Class*

  McKnight is a member of a protected class based on sex.

### B. *Adverse Action*

Although neither party formally addresses this element of McKnight's prima facie case, the Court finds that McKnight has identified four adverse actions:  (1) the Town's decision to dock her a full day's pay for leaving her home before her shift ended, (2) denial of GML §207-c benefits, (3) denial of access to the sick bank, and (4) denial of light duty.  *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (holding that adverse employment actions "might be indicated by termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation") (alteration in original) (quoting *Crady v. Liberty Nat'l Bank & Tr. Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

### C. *Qualified for Benefits*

The Town argues that McKnight cannot meet the qualification element of her prima facie case because her disability prevented her from performing the duties required of a police officer.  Contrary to the Town's argument, the relevant analysis is not whether McKnight was qualified to perform all of the duties required of a police officer, but rather whether she qualified for the benefits that she believes the Town wrongfully denied to her.  *See DiMeglio v. Vill. of Briarcliff Manor*, No. 07 Civ. 3324(LAP), 2010 WL 3664687, at *4 (S.D.N.Y. Sept. 17, 2010) (considering, in context of prima facie discrimination claim, whether plaintiff qualified for GML §207-c benefits, not whether she was qualified to perform the duties of a police officer).  This requires

the Court to analyze whether McKnight qualified for a full day's pay when she left home before her shift ended, §207-c benefits, access to the sick bank, and light duty.

A reasonable jury could find that McKnight qualified for a full day's pay even though she left her home while on leave.  To be sure, the Town's leave policy required McKnight to stay at home until her shift ended.   Nevertheless, the Town has not identified any rule or policy allowing it to withhold a full day's pay from her merely because she left home two hours early.   Next, there are genuine issues of fact concerning McKnight's eligibility for §207-c benefits.   While the Town argues that a physical examination showed that McKnight did not suffer a job-related injury, McKnight has submitted evidence suggesting that she was in fact injured during the April 2009 training session.   There are also genuine issues of fact regarding McKnight's eligibility to access the sick bank.   Although the Town claims that it denied McKnight access to the sick bank because she failed to provide documentation to the sick bank committee, McKnight has submitted evidence suggesting that the Town negligently failed to obtain this documentation on its own accord.

Finally, as to light duty, unlike the other three benefits discussed above, McKnight was not qualified to receive this benefit as a matter of law.   In August 2009, approximately one month after McKnight went on leave, she submitted an accidental disability retirement benefits application representing that she was "permanently disabled" due to back and neck injuries.  (Dkt. No. 28-1 ¶43; Dkt. No. 28-4 at 47-48). Based on her application, the New York State and Local Police and Fire Retirement System found McKnight "permanently incapacitated for the performance of duties" and awarded her retirement benefits.  (Dkt. No. 28-1 ¶¶84-85).  Where, as here, the plaintiff

files a successful disability application, her application will estop her from arguing in an employment discrimination action that she was qualified for her position unless she can provide an adequate explanation for her conflicting representations.  *See Robinson*, 781 F.3d at 46.

To qualify for light duty under the Town's Light Duty Policy, McKnight was required to submit a statement from her physician providing that she could return to full duty within six months.  McKnight's ability to meet this requirement is contradicted by her accidental disability retirement benefits application, in which she represented that she is permanently disabled.  McKnight argues, however, that her application is not inconsistent with her position in this litigation that she could have returned to full duty within six months because, after she filed her benefits application, she could have had surgery to correct her disability.  However, there is simply no evidence in the record that McKnight ever seriously contemplated surgery, or that surgery would have improved her disability.  McKnight's own doctor sent the Town a letter stating that it was a "remote possibility" that surgery would improve her condition.  (Dkt. No. 28-4 at 87).[3]  He did not opine that she could return to full duty within six months.  (*Id.*).  Moreover, on this motion, McKnight acknowledges that spinal injuries, including a ruptured disc and two injured discs, have rendered her disabled and limit her ability to work.  (Dkt. No. 36 at

---

[3]       The letter states:

> Holly McKnight is currently under my medical care as her primary care physician.  She continues to experience symptoms from her work related back injury.  This has improved though with her ongoing conservative treatments.  Her spinal surgeon has deemed her injuries as a permanent partial disability.  At this time, she would be medically cleared to return to work with [light duty] restrictions. . . .  There is a remote possibility that with continued conservative treatment, or more radical spinal surgery, that she could potentially return to full patrol duty in the future.  However, spinal surgery has only been recommended if her condition deteriorates and is no longer responsive to conservative therapy, since surgery has the small risk of making her condition worse.  (Dkt. No. 28-4 at 87).

15).  After McKnight retired, she did not have surgery to correct these injuries.  (Dkt. No. 29-3 at 43).  McKnight's contention that surgery would have allowed her to return to full duty within six months is, at best, speculative.   Thus, because McKnight has not adequately explained the inconsistency created by her disability retirement benefits application and her position in this litigation that she qualified for light duty, she is estopped from arguing that she qualified for that benefit.  *See Robinson*, 781 F.3d at 46.[4]

### D.  *Inference of Discrimination*

McKnight argues that Williams' alleged sexist remarks, along with evidence of disparate treatment, support an inference of discrimination.   In determining whether a remark is probative of discrimination, courts consider, among other factors, "when the remark was made in relation to the employment decision at issue."   *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).   A discriminatory remark made more than one year before the adverse employment action, so long as it is unrelated to the adverse action, is not probative of discriminatory intent.  *Bagdasariajn v. O'Neill*, No. 00-CV-258E(SC), 2002 WL 1628722, at *4 (W.D.N.Y. July 17, 2002) (remark made more than one year before adverse action not probative of discrimination); *Venezia v. Luxoticca Retail N. Am. Inc.*, No. 13 Civ. 4467(RJS), 2015 WL 5692146, at *6 (S.D.N.Y. Sept. 28, 2015) (remark made at least two years before plaintiff's termination not probative of discrimination).[5]

---

[4]     McKnight's reliance on *Lundy v. Town of Brighton*, 732 F. Supp. 2d 263 (W.D.N.Y. 2010) is misplaced.  In *Lundy*, the plaintiff's employer, not the plaintiff, submitted a retirement benefits application on behalf of the plaintiff stating that her disability prevented her from performing her job.  *Id.* at 269, 279.  To compare, here, it was McKnight, not the Town, who completed an accidental disability retirement benefits application representing that she was "permanently disabled."

[5]     Contrary to the Town's argument, even though Williams made some of his statements outside the applicable 300-day limitations period, McKnight may rely on those statements to support her timely

McKnight points to three comments that she believes support an inference of discrimination.  First, in 1991, Williams allegedly said that women should not be police officers.  (Dkt. No. 36-2 ¶10).  Second, around the same time, Williams allegedly asked McKnight to have sex with him.  (*Id.* ¶12).  Third, during a 2012 Executive Town Board meeting, Williams purportedly reiterated that women should not be police officers.  (*Id.* ¶51).  The first two remarks are not probative of discrimination because they occurred nearly twenty years before McKnight went on leave, and they have nothing to do with the adverse employment actions she alleges in this action.  Williams' third comment also does not support an inference of discrimination because McKnight did not attend the Town Board meeting at which Williams purportedly uttered the remark, and the basis for her knowledge of the remark is not stated.  Thus, McKnight is not competent to testify about the remark, and it has no evidentiary value.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  McKnight's conclusory contention that Williams "continued to make flirtatious comments" to her (Dkt. No. 36-2 ¶12) likewise does not support an inference of discrimination because McKnight has not supplied any details regarding the "flirtatious" comments.

McKnight also tries to establish an inference of discrimination under a disparate treatment theory, *i.e.*, by showing that she was treated less favorably than similarly situated male police officers.  "Although the ultimate burden in making a prima facie

---

claims.  *See Fratturo v. Gartner, Inc.*, No. 3:11CV113(JBA), 2013 WL 160375, at *6 (D. Conn. Jan. 15, 2013).

case is slight, the issue of whether fellow employees are similarly situated is somewhat strict." *Alenski v. Potter*, No. CV-03-2179(SJF)(MLO), 2005 WL 1309043, at *20 (E.D.N.Y. May 18, 2005) (quoting *Brown v. Middaugh*, 41 F. Supp. 2d 172, 184 (N.D.N.Y. 1999)).  To establish disparate treatment, McKnight must show that "she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quoting *Shumway*, 118 F.3d at 64).  This requires McKnight to come forward with evidence that her comparators were subject to the same performance evaluation and discipline standards, and that they engaged in comparable conduct.  *Id.* at 40.  McKnight has not made this showing with respect to any of the adverse actions she complains of.

McKnight argues that the Town opted not to punish four male officers — Kenneth Thomas, David Clark, Angelo Battera [*sic*], and Thomas Best — who left their homes while out on leave.  (*See* Dkt. No. 36-1 ¶¶47, 102).  McKnight's argument that she was treated less favorably than Clark and Butera is not supported by the evidence. McKnight cites two pages from her deposition transcript (pages 105 and 108) in support of her position, but they are not in the summary judgment record presently before the Court.  (*See* Dkt. No. 29-3 at 2-59 (excerpts from McKnight's deposition transcript)).  It appears, however, that part of the discussion in the missing pages may revolve around "water cooler" talk within the police department regarding certain male officers.  (*Id.* at 36).  "Water cooler" talk is not evidence for summary judgment purposes.  McKnight's argument that she was treated less favorably than Thomas and Best is similarly unfounded because a careful review of the deposition testimony McKnight relies upon

does not indicate that either officer violated the Town's leave policy or that the Town declined to punish them for doing so. (Dkt. No. 36-1 ¶¶47, 102).

McKnight's contention that Butera and two other male officers, Louis Billittier and John Bluman, traveled to Florida while on leave without the Town's permission is also without merit. (Dkt. No. 36-2 ¶36). Besides failing to explain the basis for her knowledge as to these officers' purported travels, McKnight has not shown that the officers were subject to the same performance evaluation and discipline standards. Without this information, there is no basis to determine whether McKnight and these officers are similarly situated in all material respects. *See Lugo v. City of N.Y.*, No. 08-CV-5250(FB)(RML), 2012 WL 3202969, at *4 (E.D.N.Y. Aug. 3, 2012) ("[Plaintiff] has submitted a list of 17 allegedly non-Hispanic NYPD officers who 'were involved in shootings' and were not terminated. Each entry on the list contains a brief notation such as 'similar incident, discharge of weapon'; only ten of the entries include the officer's name. For the purposes of summary judgment, such conclusory allegations will not suffice.") (internal citations omitted), *aff'd*, 518 F. App'x 28 (2d Cir. 2013); *Chan v. NYU Downtown Hosp.*, No. 03 Civ. 3003(RMB), 2006 WL 345853, at *4 (S.D.N.Y. Feb. 14, 2006) ("While Plaintiff lists various Hospital employees and their salaries and annual increases, she fails to raise a material issue that they were similarly situated in terms of responsibilities, tenure, experience, background, qualifications, education, etc."); *Faruq v. Wal-Mart Stores, Inc.*, No. 03-CV-192E(SC), 2006 WL 181995, at *7 (W.D.N.Y. Jan. 24, 2006) (conclusory statements that other employees violated defendant's policies do not raise genuine issue of fact as to disparate treatment).

With respect to the denial of §207-c benefits, McKnight states that the Town gave full pay to twenty male officers who were out on disability leave. (Dkt. No. 36-2 ¶¶18-23, 29). McKnight has not set forth any evidence as to whether these male officers were subject to the same evaluation and discipline standards, what injuries they suffered, or the circumstances pursuant to which they received paid leave. Nor has McKnight explained the basis for her knowledge as to the officers' injuries and leave time. Absent this information, there is no basis to determine whether McKnight and these officers are similarly situated in all material respects. *See Lugo*, 2012 WL 3202969, at *4; *Chan*, 2006 WL 345853, at *4; *Faruq*, 2006 WL 181995, at *7.

Next, McKnight contends that five male officers — Dave Coffey, Joe LaRosa, Ken Preston, Scott Kashino, and Bruce Reid — used indefinite amounts of time from the sick bank. (Dkt. No. 36-2 ¶46). No details are provided regarding these officers or their use of the sick bank, such as how many hours they contributed to the bank or how much time they received from it. McKnight's conclusory statements provide no basis to perform a disparate treatment analysis. *See Lugo*, 2012 WL 3202969, at *4; *Chan*, 2006 WL 345853, at *4; *Faruq*, 2006 WL 181995, at *7.

Lastly, McKnight argues that the Town gave nineteen male officers indefinite light duty. (Dkt. No. 36-2 ¶29). Again, however, McKnight has not provided any particulars regarding the officers' light duty assignments, including, for example, whether the officers submitted letters from their respective doctors representing that they could return to full duty within six months. This omission makes it impossible to determine whether the officers' alleged receipt of indefinite light duty violated the Light Duty Policy. Moreover, McKnight has not set forth the dates that these officers purportedly went on

light duty, which leaves open the possibility that some or all of the officers received light duty before the Town instituted its Light Duty Policy in 2008.

In sum, McKnight's disparate treatment "evidence" consists of nothing more than rumors and her own speculation that the Town treated her less favorably than male police officers.  Rumors, speculation, and other conclusory allegations are, of course, insufficient to defeat summary judgment.  Thus, McKnight has not raised a genuine issue of fact that any of the adverse actions she complains of occurred under circumstances giving rise to an inference of discrimination.  With respect to the denial of light duty, McKnight has also failed to raise an issue of fact as to whether she qualified for this benefit.  Therefore, McKnight's sex discrimination claims should be dismissed at the prima facie stage.

### E. *Pretext*

Because McKnight has not established a prima facie case of sex discrimination, the Court need not proceed to the second and third steps of the *McDonnell Douglas* analysis.  The Court notes, however, that the Town has set forth legitimate, non-discriminatory reasons for its adverse employment actions.  Specifically, the Town contends that it disciplined McKnight for leaving her residence while on leave because she did not receive advance permission for the trip (Dkt. No. 28-2 ¶60), that it denied McKnight's request for §207-c benefits because she did not suffer a job-related disability (*id.* ¶¶71, 78-79), that it denied McKnight further access to the sick bank because she did not submit documentation requested by the sick bank committee (*id.* ¶96), and, finally, that it denied McKnight light duty because she was permanently disabled (*id.* ¶¶85-87).  The Court has carefully reviewed the record for circumstantial

proof that any of the above actions were a pretext for discrimination, *see Schwapp*, 118 F.3d at 110, but has found none.  For the reasons discussed in connection with her prima facie case, there is simply no evidence that McKnight's gender played any role in the adverse actions she complains of.  Thus, her sex discrimination claims also fail at the third and final stage of the *McDonnell Douglas* analysis.  It is recommended that summary judgment be granted on McKnight's Title VII and HRL sex discrimination claims.

II.    *Failure to Accommodate Claims*

McKnight's ADA and HRL disability discrimination claims allege that the Town failed to reasonably accommodate her disability.  A reasonable accommodation claim requires the plaintiff to show "(1) plaintiff is a person with a disability . . .; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).[6]  If the plaintiff suggests a plausible accommodation, the burden shifts to the employer to show that the proposed accommodation would present an undue hardship.  *McMillan v. City of N.Y.*, 711 F.3d 120, 128 (2d Cir. 2013).

The Town does not dispute that McKnight is disabled, that it is a covered entity, or that it had notice of McKnight's disability.  It does dispute, however, that McKnight could perform the essential functions of her job with a reasonable accommodation.

---

[6]    ADA and HRL disability discrimination claims are governed by the same legal standards.  *Graves*, 457 F.3d at 184 n.3.

"Essential functions" mean the fundamental duties of the job, not functions that are merely marginal to the job. *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003).   The Court must give "considerable deference to an employer's judgment regarding what functions are essential for service in a particular position."   *Id.* (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 151 (2d Cir. 1998)).

The Town argues that the essential functions of McKnight's police officer position involve working patrol and tolerating a high degree of danger and periods of enormous physical and emotional distress.  (Dkt. No. 30 at 6).  While McKnight acknowledges that her disability limits her ability to perform the duties associated with her position (Dkt. No. 36 at 15), she argues that she could have worked light duty.   This argument is unpersuasive because the Town does not have permanent light duty positions; rather, under the Light Duty Policy, an officer may temporarily work light duty upon showing that he can return to full duty within six months.  Because McKnight could not make this showing, light duty is not a reasonable accommodation here.  The Town was under no obligation to create a permanent light duty position for McKnight.  *See Graves*, 457 F.3d at 187 (holding that an employer is not required to create a new position to accommodate a disabled employee); *Martinsky v. City of Bridgeport*, 814 F. Supp. 2d 130, 146-47 (D. Conn. 2011) (holding that position in police department's "booking" unit was not a reasonable accommodation because the department had an "established policy of rotating officers through booking, rather than letting an officer remain in a position in booking for an extended period of time"), *aff'd*, 504 F. App'x 43 (2d Cir. 2012).[7]

---

[7]     Although the Town granted McKnight light duty in 2001, this was well before the Town adopted its Light Duty Policy in 2008.   In any event, even assuming that the Light Duty Policy applied in 2001,

The Town's Light Duty Policy is not an unlawful "100% healed policy."  A 100% healed policy requires an employee to show that she is completely healed before she may return to work.  *Warmsley v. N.Y. City Transit Auth.*, 308 F. Supp. 2d 114, 122 (E.D.N.Y. 2004).  Such policies have been found to violate the ADA because they fail to take into consideration whether the employee can perform the essential functions of her job with or without a reasonable accommodation.  *Id.*  The Light Duty Policy is not a 100% healed policy because it requires an officer to show that she can perform the essential functions required of a police officer, not that she is completely healed.

McKnight also argues that in December 2009, when Carmen Kesner was Chief of Police, Kesner made "arrangements" for McKnight to work light duty.  (Dkt. No. 36-2 ¶13).  McKnight has not provided any details concerning these arrangements, nor has she explained whether the arrangements complied with the Light Duty Policy.  Thus, the purported arrangements do not support McKnight's reasonable accommodation claims.[8]

For these reasons, McKnight could not perform the essential functions of her job, with or without a reasonable accommodation.[9]  While the circumstances surrounding McKnight's disability and retirement are unfortunate, the ADA and HRL simply do not apply here.  Therefore, the Court recommends that summary judgment be granted in favor of the Town on McKnight's ADA and HRL failure to accommodate claims.

---

McKnight's light duty assignment appears to have complied with the Policy because she returned to full duty in less than six months.  (Dkt. No. 28-1 ¶26).

[8]     The Town also argues that McKnight's disability claims fail because she never requested a reasonable accommodation.  Although an employee generally must advise her employer that she needs an accommodation, this requirement does apply where the employer "knew or reasonably should have known that the employee was disabled."  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008).  Here, there are genuine issues of fact as to whether McKnight requested an accommodation, as shown by her sick bank application in which she referenced light duty.  Even assuming, however, that McKnight never requested an accommodation, the Town well knew McKnight was disabled because she was out of work for over one year and she had applied for disability benefits.

[9]     Because McKnight has not identified a plausible accommodation, the burden has not shifted to the Town to show that any proposed accommodation presents an undue hardship.

III.     *WCL Claim*

In her motion papers, McKnight withdrew her WCL claim.  (Dkt. No. 36 at 21). Thus, it is recommended that the Court grant summary judgment to the Town on this cause of action.

## CONCLUSION

For the foregoing reasons, it is recommended that the Town's motion for summary judgment (Dkt. No. 28) be GRANTED.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L.R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R. Civ. P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED.**

Dated:       April 25, 2016
             Buffalo, New York

                                        /s/ Michael J. Roemer
                                        MICHAEL J. ROEMER
                                        United States Magistrate Judge